**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

THE ESTATE OF SCOTT W.
THOMPSON, by the Personal
Representatives, RANDY W.
THOMPSON and VICKY J.
THOMPSON, and RANDY W.
THOMPSON and VICKY J.
THOMPSON, Individually,

       Plaintiffs,

vs.

KAWASAKI HEAVY INDUSTRIES,
LTD., KAWASAKI MOTORS CORP.,
U.S.A., and OHLINS RACING AB,

      Defendants.

No. C 11-4026-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

---

**TABLE OF CONTENTS**

**I.   INTRODUCTION**............................................................... 2
    *A.   Factual Background* ................................................... 2
    *B.   Procedural Background* ............................................. 5

**II.  LEGAL ANALYSIS** ...................................................... 8
    *A.   Standards For Summary Judgment* ............................... 8
    *B.   Claims No Longer At Issue* ....................................... 9
    *C.   The "Manufacturing Defect" Claims*......................... 11
        *1.   Arguments of the parties*............................... 12
        *2.   "Manufacturing defect" standards* ................... 14
        *3.   Application of the standards* .......................... 17
            *a.   Departure from intended design* ............... 17
            *b.   Causation*........................................ 21
    *D.   The "Design Defect" Claim Against Ohlins*................. 22
        *1.   Arguments of the parties*............................... 22
        *2.   Component manufacturer liability for a "design defect"*......... 23

        *3.*      *Application of the standards* ............................................ *26*
    **E.**     **Punitive Damages Claims** ...................................................... *29*
        *1.*      *Arguments of the parties* ............................................... *29*
        *2.*      *Standards for punitive damages under Iowa law* .................. *31*
        *3.*      *Application of the standards* ............................................ *34*
***III.***   ***CONCLUSION*** ................................................................................ *36*

In this diversity action under Iowa products liability law, arising from a motorcycle accident, I am asked to determine whether the plaintiffs are entitled to present to a jury both their design defect and manufacturing defect claims and, if so, whether the plaintiffs can assert either or both claims against the motorcycle manufacturer and the manufacturer of an adjustable steering damper incorporated into the motorcycle's steering mechanism. These questions, and others, are presented on the defendants' motions for summary judgment.

## I.    INTRODUCTION

### A.    *Factual Background*

As is my usual practice, I set forth here only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the defendants' motions for summary judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. I will discuss

additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

At about sunset on March 21, 2009, Scott Thompson was riding his 2007 Kawasaki Ninja ZX-10R motorcycle in a convoy with two friends on county road K-22 in Plymouth County, Iowa. One of Thompson's friends, Dave Lachioma, who was also riding a motorcycle, led the convoy, the other friend, Michael Welter, followed in his car, and Thompson brought up the rear on his motorcycle. While driving northbound on K-22, Thompson passed Welter, who was driving at 60 to 65 mph. A few seconds after Thompson passed him, Welter observed the taillight of Thompson's motorcycle wobble from side to side. Although Welter observed that it looked like Thompson was regaining control of his motorcycle, Thompson was tossed from the motorcycle, slid on his back, feet first, across the highway, and landed in a ditch on the west side of the highway. The motorcycle continued upright in the northbound lane for another several hundred feet, before exiting the highway on the east side. As a result of the accident, Thompson suffered a burst fracture at the T3-T4 vertebrae, causing paralysis below that level. Thompson died on December 25, 2011.

Turning to essential background on motorcycle performance, "kickback" occurs when there is a disturbance to the motorcycle, such as a gap in the pavement might cause, that creates handlebar vibrations. "Convergence" occurs when kickback decreases and disappears as the motorcycle continues to run. In contrast, "expansion" occurs when kickback continues to increase as the motorcycle continues to run. Kickback expansion, in turn, can turn into "wobble" of the motorcycle, but if kickback convergence occurs within an acceptable time frame, "wobble" is avoided. Wobble can make it difficult for a rider to control the motorcycle.

The parties agree that a "steering damper" is a device with which a motorcycle can be equipped for the purpose of minimizing kickback and bringing about faster

convergence—indeed, Kawasaki expressly concedes that a steering damper is a "safety device" for that purpose. In general, the higher the dampening force in a steering damper, the quicker kickback can be dampened. A "dampening curve" provides the various dampening levels at a particular velocity (piston speed) for a particular steering damper. The dampening curves are generated through laboratory tests by a hydraulic machine referred to as a "dyno machine" (dynamometer). A steering damper may be adjustable, that is, have different "click positions," which adjust the dampening to rider preferences. The plaintiffs allege that Thompson's motorcycle accident was the result of the defective design and/or manufacture of his 2007 Ninja ZX-10R motorcycle, because the steering damper on the motorcycle was insufficient and the motorcycle was not reasonably stable.

Defendant Kawasaki Heavy Industries, Ltd. (KHI), a Japanese company, admits that it is responsible for the design, developmental testing, and manufacture of the 2007 Kawasaki ZX-10R model motorcycle at issue in this case. Defendant Kawasaki Motors Corp., U.S.A. (KMC), a Delaware corporation with its principal place of business in Irvine, California, admits that it is responsible for the marketing of the motorcycle in question in the United States and the wholesale sale of the motorcycle in question to independent dealers in the United States. The parties agree that the motorcycle in question was equipped with a steering damper, as an Original Equipment Manufacturer (OEM) component, designed and manufactured by Ohlins Racing, AB (Ohlins), a Swedish company with its principal place of business in Väsby, Sweden.

The parties agree that both the 2006 model and the 2007 model Ninja ZX-10R motorcycles are part of Kawasaki's 1010 motorcycle platform and that they have the identical chassis. Indeed, they agree that the only difference between the 2006 and the 2007 model year Ninja ZX-10R is that the steering dampers on the two models are different. In over a year-and-a half of development of the model year 2006 Ninja ZX-

10R motorcycle, Kawasaki selected the Ohlins model SD-1790 steering damper with specific dampening levels and values that Kawasaki believed provided the optimal performance for the customer and the best fit for the 2006 model year. On March 10, 2006, however, Kawaski made the decision to modify the steering damper on the 2007 Ninja ZX-10R by reducing the dampening value. This decision followed a test ride in which the mounting bracket for the steering damper failed. The parties agree that, on April 11, 2006, Mr. Björkman, an Ohlins design engineer, wrote an e-mail to Kawasaki about the change, in which he stated, "I don't think you want very much less damping either, because there is almost no function left." Plaintiffs' Appendix at 47, Exhibit 3. The parties dispute whether Mr. Björkman was stating a safety concern or simply relaying performance concerns from racing customers. Ultimately, Kawasaki selected the Ohlins model SD-1791 steering damper for the 2007 Ninja ZX-10R motorcycle to replace the SD-1790 steering damper that had been used on the 2006 Ninja ZX-10R. Although the parties dispute the precise values, they agree that the steering damper on the 2007 Ninja ZX-10R model had significantly less viscous dampening for the motorcycle system (a maximum of 1750 newtons at .6 meters per second) than the steering damper on the 2006 Ninja ZX-10R (a maximum of either 4000 or 3600 newtons at .6 meters per second).

### B.    Procedural Background

On March 16, 2011, prior to Scott Thompson's death, Randy W. Thompson and Vicky J. Thompson, individually and as personal representatives of Scott Thompson, filed a Complaint (docket no. 2), initiating this action against various defendants, including KHI, KMC, and Ohlins, and alleging claims arising from Scott Thompson's accident. The Thompsons' controlling pleading is now their First Amended Complaint (docket no. 48), filed on April 23, 2012, after Scott Thompson's death. In their First

Amended Complaint, the Thompsons assert claims of "strict liability product defects," alleging both "design" and "manufacturing" defects, "breach of implied warranty of fitness for a particular purpose," and "negligence" against KHI and KMC, in **Counts I**, **II**, and **III**, respectively; similar claims against Ohlins, in **Counts IV**, **V**, and **VI**, respectively; and a claim for "punitive damages" against KHI, KMC, and Ohlins in **Count VIII**.[1]   KMC and KHI filed separate Answers (docket nos. 49 and 50, respectively) on May 4, 2012, and Ohlins filed its Answer (docket no. 52) on May 7, 2012, denying the claims against them in the Thompsons' First Amended Complaint.

On November 5, 2012, KMC and KHI, referring to themselves collectively as "Kawasaki," filed their Motion For Partial Summary Judgment (docket no. 64), seeking summary judgment in their favor on that part of the Thompsons' "product defects" claim alleging a "manufacturing defect"—but not on the part alleging a "design defect"—their "breach of implied warranty" claim, their "negligence" claim, and their prayer for "punitive damages."   On November 5, 2012, Ohlins's filed its Joinder In Motion For Summary Judgment (docket no. 66), seeking summary judgment in its favor on the same claims as Kawasaki, but accompanied by a separate brief, statement of undisputed facts, and appendix.   After obtaining authorization and extensions of time to do so, Ohlins filed its November 27, 2011, Supplemental (Amended And Substituted) Motion For Summary Judgment (docket no. 71), adding that Ohlins is also entitled to summary judgment on the Thompsons' "design defect" claim.

On December 18, 2012, the Thompsons filed separate Responses (docket nos. 73 and 74, respectively) to Kawasaki's Motion For Partial Summary Judgment and Ohlins'

---

[1] **Count VII** of the First Amended Complaint was a negligence claim against defendant MidAmerica Motoplex, Inc., the business that sold Scott Thompson the motorcycle in question, but that defendant has since been dismissed from this action.

Supplemental (Amended And Substituted) Motion For Summary Judgment. Kawasaki filed a Response (docket no. 75) to the Thompsons' statement of additional facts and a Reply (docket no. 76) in further support of its Motion For Partial Summary Judgment on December 28, 2012. After an extension of time to do so, Ohlins filed a Reply (docket no. 80) to the Thompsons' statement of additional facts.

By Order (docket no. 82), dated January 11, 2013, I granted the Thompsons leave to file a supplemental response to the defendants' Motions For Summary Judgment, based on their assertion that they had only recently obtained additional information relevant to their responses. On January 14, 2013, the Thompsons filed their Supplemental Opposition To Ohlins's Motion For Summary Judgment (docket no. 84), and their Supplemental Opposition To Kawasaki's Motion For Partial Summary Judgment (docket no. 85). On January 21, 2013, Kawasaki filed its Reply (docket no. 86) and its Response To Plaintiffs' Supplemental Statement Of Additional Material Facts To Defendant Kawasaki (docket no. 87), in response to the Thompsons' Supplemental Opposition to Kawasaki's Motion For Partial Summary Judgment. Also on January 21, 2013, Ohlins filed its Reply, denominated its Response To Plaintiffs' Supplemental Brief In Opposition To [Its] Motion For Summary Judgment (docket no. 88), in further support of its Motion For Summary Judgment.

The parties requested oral arguments on the summary judgment motions. My crowded schedule has not permitted the timely scheduling of such oral arguments, and I find that the parties' written submissions on the issues presented are sufficient to resolve the pending motions without oral arguments. Therefore, I will resolve the motions based on the parties' written submissions.

## II.     LEGAL ANALYSIS

### A.     Standards For Summary Judgment

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"

> *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at
> 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*).
Summary judgment is particularly appropriate when only questions of law are involved,
rather than factual issues that may or may not be subject to genuine dispute. *See, e.g.,*
*Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## B.      Claims No Longer At Issue

Kawasaki seeks summary judgment on all but the Thompsons' "design defect"
claim—that is, on the Thompsons' "manufacturing defect," "breach of implied
warranty," "negligence," and "punitive damages" claims—and Ohlins joined in
Kawasaki's motion on those claims, then asserted its own substituted motion for
summary judgment on those claims and the "design defect" claim against it.  In their
Responses (docket nos. 73 and 74, respectively), the Thompsons expressly do not resist
summary judgment on their "breach of implied warranty" and "negligence" claims,
because they believe that Iowa law recognizes only a single claim for liability for
product defects, pursuant to the RESTATEMENT (THIRD) OF TORTS, PRODUCT LIABILITY
(RESTATEMENT (THIRD)), encompassing design and manufacturing defects and
negligence principles.  They note that they intend to pursue their "design defect" claim,
which Kawasaki has not challenged, but Ohlins now has challenged, their
"manufacturing defect" claim, which Kawasaki and Ohlins have both challenged, and
their "punitive damages" claim which Kawasaki and Ohlins have also both challenged.

As the Iowa Supreme Court most recently explained, in *Scott v. Dutton-Lainson
Co.*, 774 N.W.2d 501 (Iowa 2009),

> In *Wright [v. Brooke Group Ltd.*, 652 N.W.2d 159 (Iowa
> 2002)], we adopted the Restatement (Third) of Torts:
> Products Liability sections 1 and 2 (1998) [hereinafter Third

> Products Restatement]. *Wright*, 652 N.W.2d at 169. The
> Third Products Restatement recognizes that "strict liability is
> appropriate in manufacturing defect cases, but negligence
> principles are more suitable for other defective product
> cases." *Id*. at 168. Therefore, *Wright* adopted a standard of
> risk-utility analysis, which incorporates a consideration of
> reasonableness, for design defect claims, but chose to "label
> a claim based on a defective product design as a design
> defect claim without reference to strict liability or
> negligence." *Id*. at 169.

*Scott*, 774 N.W.2d at 504 (footnote omitted) (also noting that "*Wright* rejected the
categorical labels of strict liability or negligence in the context of design defects").

The court in *Scott* also observed,

> Comment *c* of the Third Products Restatement section 2
> notes that "[a]lthough Subsection (a) calls for liability
> without fault [in manufacturing defect claims], a plaintiff
> may seek to recover based upon allegations and proof of
> negligent manufacture." Third Products Restatement § 2
> cmt. *c*, at 18; *see also* Third Products Restatement § 2 cmt.
> *n*, at 36. If manufacturing defect claims are brought under a
> negligence theory, the categorical strict liability exception in
> rule 5.407 would not apply.

*Scott*, 774 N.W.2d at 505 n.3. This observation suggests that a "negligent
manufacturing defect" claim is still tenable under Iowa law, even after *Wright*.[2]
Similarly, the Iowa Supreme Court observed in *Scott*,

---

[2] I have previously noted that RESTATEMENT (THIRD) § 2(a) authorizes both a
"strict liability" and a "negligence" claim based on a "manufacturing defect" and
identifies some of the differences and similarities between them:

> As the RESTATEMENT (THIRD) explains, in comment
> *n* to § 2, the strict liability rule set forth in subsection (a)
> does not require risk-utility assessment, but a negligence
> claim does. RESTATEMENT (THIRD) § 2(a) cmt. *n*.
> However, "[w]hat must be shown under either [a negligence

> *Wright* held . . . that a claim for breach of implied warranty
> under Iowa Code section 554.2314(2)(c) "requires proof of
> a product defect as defined in Products Restatement section
> 2." *Wright*, 652 N.W.2d at 181-82. Therefore, a breach of
> warranty claim will require proof of the standard for either a
> manufacturing defect, a design defect, or a failure to warn.

*Scott*, 774 N.W.2d at 505 n.2. This observation suggests that a "breach of implied warranty" claim may also be tenable under Iowa law, even after *Wright*.

Nevertheless, where the Thompsons concede that summary judgment is appropriate on their "breach of implied warranty" and "negligence" claims under Iowa law, I will grant the defendants' Motions For Summary judgment on the Thompsons' "breach of implied warranty" and "negligence" claims.

### C. The "Manufacturing Defect" Claims

More analysis is required of claims still in dispute. Among those claims are the Thompsons' "manufacturing defect" claims against both Kawasaki and Ohlins. I will first summarize the parties' arguments for and against summary judgment on the "manufacturing defect" claims.

---

> or strict liability] theory is that the product in question did,
> in fact, have a manufacturing defect at the time of sale that
> contributed to causing the plaintiff's harm." *Id*. Thus, if
> the [product] did not have a manufacturing defect at the time
> of sale, then [the plaintiff's] manufacturing defect claim
> would fail under either a negligence or a strict liability
> theory.

*Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr., Inc.*, 816 F. Supp. 2d 631, 663 (N.D. Iowa 2011).

### 1.     *Arguments of the parties*

Kawasaki argues that, although the Thompsons have alleged that the motorcycle contained a manufacturing defect—that is, that the motorcycle departed from its intended design, because the steering damper failed to provide sufficient dampening and/or the motorcycle was unstable—the Thompsons have failed to produce any evidence that the motorcycle deviated appreciably from Kawasaki's intended design.[3] More specifically, Kawasaki argues that, even though it has produced design drawings and explained the specifications for the motorcycle, the Thompsons' experts have not identified any way in which the steering damper or the motorcycle deviated from the intended designs. Kawaski points out that its representative testified in depositions that the steering damper was designed to have a maximum dampening force of 1.5 kilonewtons at .6 meters per second with a tolerance of 30% to account for variation in each motorcycle. Kawasaki asserts that neither of the Thompsons' engineering experts has opined that the steering damper on Scott Thompson's motorcycle departed from that intended design; rather, they have both opined that the maximum dampening level of the steering damper was insufficient—a "design defect" issue. Similarly, Ohlins argues that the Thompsons have pointed to nothing in admissible evidence showing that the steering damper departed from its intended design or failed to conform to the manufacturer's specifications.

---

[3] Kawasaki states the pertinent element of a "manufacturing defect" claim under Iowa law to be that "'the motorcycle was defectively manufactured because it *deviated in some appreciable manner* from Kawasaki's intended design,'" purportedly quoting *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159, 178 (Iowa 2002), with emphasis added by Kawasaki. *See* Kawasaki's Brief (docket no. 64), 5. Interestingly, the purportedly quoted language appears nowhere on page 178 of the *Wright* decision, on any other page of the *Wright* decision, or, so far as I have been able to determine, anywhere in any published decision by any state or federal court. Nor does it appear in RESTATEMENT (THIRD) § 2, concerning "categories of product defect," the comments or illustrations to that section, or the summaries of any cases interpreting that section.

In their original Responses, the Thompsons asserted that information relevant to their "manufacturing defect" claims had recently been produced, so that they required additional time to respond to the defendants' Motions For Summary Judgment on these claims. After being granted leave to supplement their Responses, the Thompsons argue that the steering damper (SD1791) on Scott Thompson's 2007 Ninja ZX-10R did have a manufacturing defect, because it failed to meet the functional specification for left-right balance tolerance of no more than 30% as established by Ohlins, that the left-right balance (compression-rebound balance) plays a role in the overall stability of the motorcycle, and that, because the subject damper was out of specification on the "minus" side, the manufacturing defect caused the subject steering damper to have even less dampening force than specified by Kawasaki and Ohlins. They point to testing data from Drinan Products on October 12, 2012, and from RE Suspension in North Carolina on November 19, 2012, which they assert show left-right balance differences in the subject damper well in excess of 30%.

In reply, Kawasaki asserts that nothing in the record shows that it called for the functional specification on which the Thompsons rely. Kawasaki also argues that, as Ohlins has explained, the functional specification was an internal testing tolerance, not a design "specification," and that it related to "click" position 15, but the Thompsons' own expert has opined that the steering damper on Scott Thompson's motorcycle was set at "click" position 5, 11, or 17, making a purported "specification" for "click" position 15 irrelevant. In arguments that Kawasaki also adopts, Ohlins asserts that, even if the "tolerance" is accepted as a design "specification," the October 2012 and November 2012 test data on which the Thompsons rely are not evidence that the subject damper was out of tolerance, because the dynamometers used in those tests were never "correlated" to the dynamometer used by Ohlins to conduct the testing that the Thompsons now assert created the manufacturing specification. Ohlins also points out

that the subject steering damper was not new, had been in an accident, had been subjected to numerous expert tests, and had been exposed to Midwestern winter weather conditions, all of which can affect performance. Ohlins points out that no expert has opined that, when the testing data was properly "correlated" to the Ohlins dynamometer, it showed that the damper was outside of the 30% left-right balance tolerance. Ohlins also asserts that the Thompsons have failed to generate a genuine issue of material fact, based on admissible evidence, that any manufacturing defect was a proximate cause of Scott Thompson's accident, relying only on one expert's conclusory assertion that the purported manufacturing defect "aggravated the problem of the subject motorcycle having insufficient steering damping and played a role in contributing to cause the accident."

### 2. *"Manufacturing defect" standards*

As the Eighth Circuit Court of Appeals has noted,

> "Courts and the Restatement of Torts distinguish between design defects and manufacturing defects." *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1190 n. 18 (11th Cir. 2009); *see also Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 542 n. 2 (Iowa 2006) ("Design and manufacturing defects are, of course, significantly different...."). "[T]he distinction is between an unintended configuration [a manufacturing defect], and an intended configuration that may produce unintended and unwanted results [a design defect]." *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989).

*Linden v. CNH America, L.L.C.*, 673 F.3d 829, 834 (8th Cir. 2012).

More specifically, the Iowa Supreme Court has defined a "manufacturing defect," within the meaning of Iowa products liability law, as follows: "'A product 'contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the

product.'" *Scott*, 774 N.W.2d at 505 (quoting RESTATEMENT (THIRD) § 2(a), and also noting that "[t]his definition is consistent with strict liability because fault is assessed regardless of the exercise of all possible care," citing *Wright*, 652 N.W.2d at 168). Under this definition of a "manufacturing defect," the Iowa Supreme Court has explained, "Clearly, . . . a plaintiff may not recover from [a product manufacturer] under a manufacturing defect theory when the [product used] by the plaintiff w[as] in the condition intended by the manufacturer." *Wright*, 652 N.W.2d at 178 (noting that several courts had reached the same conclusion under the principles of the RESTATEMENT (SECOND) OF TORTS). Comment *c* to RESTATEMENT (THIRD) § 2 also clarifies some of the requirements for proof of a "manufacturing defect" claim, as follows:

> *c. Manufacturing defects.* As stated in Subsection (a), *a manufacturing defect is a departure from a product unit's design specifications.* More distinctly than any other type of defect, manufacturing defects disappoint consumer expectations. Common examples of manufacturing defects are products that are physically flawed, damaged, or incorrectly assembled. *In actions against the manufacturer, under prevailing rules concerning allocation of burdens of proof the plaintiff ordinarily bears the burden of establishing that such a defect existed in the product when it left the hands of the manufacturer.*

RESTATEMENT (THIRD) § 2, cmt. *c* (emphasis added).

In light of *Wright* and other authorities, the Eighth Circuit Court of Appeals has concluded that, under Iowa law, "essential elements" of a manufacturing defect claim are (1) the intended design of the product, and (2) how the manufacturing of the particular product at issue departed from the intended product design, and that court has held that, when a plaintiff fails to prove one or both of these elements, summary judgment in favor of the defendant is appropriate. *Depositors Ins. Co. v. Wal-Mart*

*Stores, Inc.*, 506 F.3d 1092, 1095 (8th Cir. 2007). I have also observed, in a prior case involving a "manufacturing defect" claim under RESTATEMENT (THIRD) § 2(a), as adopted by the Iowa Supreme Court, that "'[w]hat must be shown under either [a negligence or strict liability] theory is that the product in question did, in fact, have a manufacturing defect at the time of sale *that contributed to causing the plaintiff's harm.*'" *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr., Inc.*, 816 F. Supp. 2d 631, 663 (N.D. Iowa 2011) (quoting RESTATEMENT (THIRD) § 2, cmt. *n*, with emphasis added here). Thus, there is a "causation" requirement for a strict liability "manufacturing defect" claim. This conclusion is consistent with the Iowa Supreme Court's recognition, well before it adopted RESTATEMENT (THIRD) § 2, that, even in strict liability cases, including products liability cases, the plaintiff must prove that the defendant's actions were a proximate cause of the plaintiff's damages. *See, e.g., Hagen v. Texaco Ref. & Mktg., Inc.*, 526 N.W.2d 531, 537 (Iowa 1995).

It is not surprising, then, that Iowa Civil Jury Instruction No. 1000.1 states the elements of a manufacturing defect claim, in light of *Wright* and RESTATEMENT (THIRD) § 2(a), as follows:

> In order to recover on a claim that defendant's product contains a manufacturing defect, the plaintiff must prove all of the following propositions:
>
> 1. The defendant sold or distributed the (product);
>
> 2. The defendant was engaged in the business of selling or distributing the (product);
>
> 3. The (product) at the time it left defendant's control contained a manufacturing defect that departed from its intended design, in one or more of the following ways: (Set out particulars as supported by the evidence);
>
> 4. The manufacturing defect was a proximate cause of plaintiff's damages; and

> 5. The amount of damages.
>
> If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount. [If an affirmative defense is submitted, delete the second sentence and insert the following: If the plaintiff has proved all of these propositions, then you will consider the defense of _____ as explained in Instruction No. ____.]

Iowa Civil Jury Instruction No. 1000.1. Nor is it surprising that I have previously found that "this formulation of the elements of a manufacturing defect claim is consistent with the formulation of the claim in *Wright* and RESTATEMENT (THIRD) § 2(a)." *Nationwide Agribusiness Ins. Co.*, 816 F. Supp. 2d at 663 n.8.

### 3. *Application of the standards*

The "fighting issues" on Kawasaki's and Ohlins's Motions For Summary Judgment on the Thompsons' "manufacturing defect" claims are whether or not the Thompsons can prove—or, for now, generate genuine issues of material fact on—the third and fourth elements of such a claim, as set out just above. I will consider those elements, in turn.

### a. *Departure from intended design*

To defeat summary judgment on this claim, on the basis of the third element, the Thompsons must generate genuine issues of material fact that the steering damper on Scott Thompson's 2007 Ninja ZX-10R motorcycle, or the motorcycle itself, at the time it left the particular defendant's control, contained a manufacturing defect that departed from its intended design, in one or more ways. Iowa Civil Jury Instruction No. 1000.1; *Nationwide Agribusiness Ins. Co.*, 816 F. Supp. 2d at 663 n.8. As the Eighth Circuit Court of Appeals has suggested, this element has two prongs, which are both "essential elements" of the claim: (1) the intended design of the product, and (2) how

the manufacturing of the particular product at issue departed from the intended product design. *Depositors Ins. Co.*, 506 F.3d at 1095.

In their First Amended Complaint, the Thompsons allege that the "manufacturing defects" in Scott Thompson's 2007 Ninja ZX-10R motorcycle were that the steering damper failed to provide sufficient dampening and/or that the motorcycle was unstable. *See* First Amended Complaint, **Count I**, ¶ 27(a) and (b); **Count IV**, ¶ 62(a). Even in their Supplemental Responses to Kawasaki's and Ohlins's Motions For Summary Judgment, specifically addressing the "manufacturing defect" claims, the Thompsons have not put at issue any "intended design" of the 2007 Ninja ZX-10R motorcycle other than the "intended design" of the steering damper, nor have they identified any way in which Scott Thompson's 2007 Ninja ZX-10R motorcycle departed from its intended design, such that it was "unstable," other than the alleged departure of the steering damper from the intended design for that part. Because the Thompsons have not come forward with specific facts showing that there is a genuine issue for trial on the intended design of the 2007 Ninja ZX-10R motorcycle as to any aspect other than the steering damper, or any departure from the intended design in Scott Thompson's 2007 Ninja ZX-10R motorcycle apart from the steering damper, the defendants are entitled to summary judgment on any part of the Thompsons' "manufacturing defect" claims against them relating to any "manufacturing defect" in the motorcycle other than in the steering damper. *See Torgerson*, 643 F.3d at 1042-43.

Turning to the alleged "manufacturing defect" in the steering damper, I must first consider whether the Thompsons have generated genuine issues of material fact on the intended design of the steering damper. *Depositors Ins. Co.*, 506 F.3d at 1095 (concluding that proof of departure from intended design requires proof of both (1) the intended design of the product, and (2) how the manufacturing of the particular product at issue departed from the intended product design); *see also* Iowa Civil Jury

Instruction No. 1000.1 (stating the pertinent element as departure from intended design); *Nationwide Agribusiness Ins. Co.*, 816 F. Supp. 2d at 663 n.8 (same). Kawasaki has conceded that its representative, Mr. Okabe, testified in depositions that the steering damper was designed to have a maximum dampening force of 1.5 kilonewtons at .6 meters per second with a tolerance of 30% to account for variation in each motorcycle. *See* Kawasaki's Brief at 6 (citing Okabe's Deposition, 54:3-55:4, 60:11-61:2, and Kawasaki's Appendix, Exhibit E, pp. 110, 111). Ohlins disputes that the Thompsons have identified *any* intended design of the steering damper, because Ohlins asserts that the functional specification for left-right balance tolerance of no more than 30%, on which the Thompsons rely, was not a "design specification" at all, but an internal testing tolerance. Ohlins also argues that the "left-right balance tolerance," if it was a "design specification," related to "click" position 15, but the Thompsons' own expert has opined that the damper on Scott Thompson's motorcycle was set at "click" position 5, 11, or 17, making a purported "specification" for "click" position 15 irrelevant.

Although I believe that Kawasaki and Ohlins probably have the better jury *argument*, I nevertheless conclude that the Thompsons have generated genuine issues of material fact that Kawasaki and Ohlins had a "design specification," that is, an "intended design" for the steering damper that required a maximum dampening force of 1.5 kilonewtons at .6 meters per second with a tolerance of 30% to account for variation in each motorcycle, as Mr. Okabe testified and Kawasaki conceded, and a left-right balance tolerance of no more than 30%. That is, from the evidence in the record cited by the Thompsons, viewed in the light most favorable to the Thompsons, a rational trier of fact could find that these were design specifications for the steering damper, not merely testing tolerances. *Torgerson*, 643 F.3d at 1042-43. Although Ohlins contends that the purported left-right balance tolerance of no more than 30%

was only an internal testing standard and that such a standard specified for "click" position 15 is "irrelevant," where the Thompsons' expert has opined that the steering damper on Scott Thompson's motorcycle was set at "click" position 5, 11, or 17, I conclude that these challenges go to the weight of the evidence of a "design specification," not to the existence of evidence of a "design specification" or "intended design," as a matter of law.

I come to a very different conclusion with regard to the prong of this element that requires proof of how the manufacturing of the particular product or component at issue departed from the intended product design. *Depositors Ins. Co.*, 506 F.3d at 1095. First, however, I do not agree with the defendants that evidence that the subject steering damper was not new, had been in an accident, had been subjected to numerous expert tests, and had been exposed to Midwestern winter weather conditions, all of which can affect performance, proves beyond dispute that the subject steering damper was not defective; rather, such evidence only generates genuine issues of material fact about whether the testing data shows that the subject steering damper departed from the intended design at the time of the accident.

On the other hand, I do agree with the defendants that the Thompsons have failed to generate a genuine issue of material fact on a defect in the particular steering damper on Scott Thompson's motorcycle, despite the testing data on which they rely, where there is no showing that the dynamometers used in those tests were ever "correlated" (I think meaning "calibrated") to the dynamometer used by Ohlins to conduct the testing that the Thompsons now assert created the design specification, and no expert has opined that, when the testing data is properly correlated to the Ohlins dynamometer, it showed that the damper was outside of the 30% left-right balance tolerance. Without a baseline for comparison, from calibration of the testing equipment used by Drinan Products and RE Suspension to Ohlins's testing equipment, which

purportedly established the intended design, or correlation of the Drinan Products and RE Suspension data to Ohlins's testing data, testing data are merely numbers, not proof of anything. *See, e.g., American & Foreign Ins. Co. v. General Electric Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (rejecting expert evidence, in part, because the expert was unsure whether equipment had been calibrated). Furthermore, "[c]onclusory expert testimony is not sufficient to defeat a motion for summary judgment." *Northwest Airlines, Inc. v. Phillips*, 675 F.3d 1126, 1134 (8th Cir. 2012) (citing *Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 485 (8th Cir. 1997)).

Therefore, the defendants are entitled to summary judgment on the Thompsons' "manufacturing defect" claim on the ground that the Thompsons' have failed to generate genuine issues of material fact on the element requiring proof that the subject steering damper departed from the intended design of such steering dampers.

### b.    Causation

In addition or in the alternative, I conclude that the defendants are entitled to summary judgment on the Thompsons' "manufacturing defect" claims, because the Thompsons have failed to generate genuine issues of material fact on the "causation" element of such a claim. Iowa Civil Jury Instruction No. 1000.1 (requiring proof that the "manufacturing defect" was a proximate cause of the plaintiff's damage); *Nationwide Agribusiness Ins. Co.*, 816 F. Supp. 2d at 663 n.8 (same). The Thompsons assert that one of their experts, Mark Ezra, has concluded that the manufacturing defect in the steering damper, regarding left-right dampening tolerances, contributed to cause Scott Thompson's accident. As Ohlins contends, this expert's causation conclusion is based on a faulty premise, making it insufficient to generate a genuine issue of material fact on "causation," because of the lack of calibration of the testing equipment or correlation of the testing data from which the expert purports to find a manufacturing

defect. Again, "[c]onclusory expert testimony is not sufficient to defeat a motion for summary judgment." *Northwest Airlines, Inc.*, 675 F.3d at 1134.

Therefore, both Kawasaki and Ohlins are entitled to summary judgment on the Thompsons' "manufacturing defect" claims on the ground that the Thompsons' have failed to generate genuine issues of material fact on the "causation" element of such a claim.

## D.     The "Design Defect" Claim Against Ohlins

Ohlins also seeks summary judgment on the Thompsons' "design defect" claim against it. The Thompsons argue that they have generated genuine issues of material fact that Ohlins, as well as Kawasaki, can be held liable on this claim. Once again, I begin my analysis of this claim with a summary of the arguments of the parties.

### 1.     *Arguments of the parties*

In its Supplemental (Amended And Substituted) Motion For Summary Judgment (docket no. 71), Ohlins argues that the Thompsons have no evidence to suggest that the design of the SD 1791 steering damper was defective *per se*. Ohlins argues that the "design defect" claim is actually directed at the decision to use the SD-1791 steering damper, with lesser dampening force, on the 2007 Ninja ZX-10R motorcycle, instead of the SD-1790 steering damper that had been used on the 2006 Ninja ZX-10R motorcycle. Ohlins asserts that there is no evidence that it was involved in that decision; rather, it was simply the vendor of an individual component incorporated into the motorcycle by Kawasaki. Ohlins points out that one of the Thompsons' experts, Mark Ezra, stated that he had no criticism of Ohlins's design of the SD 1791 steering damper itself.

In response, the Thompsons paint a much different picture, asserting that Ohlins substantially participated in the selection of the steering damper for the 2007 Ninja ZX-

10R motorcycle, citing RESTATEMENT (THIRD) § 5. More specifically, the Thompsons assert that Ohlins offered advice about the appropriate steering damper for the 2006 Ninja, worked with Kawasaki for over a year on the steering mechanism for that model, and forced changes to Kawasaki's steering design. They argue that one of their experts, Mr. Higinbotham, has described the relationship between Ohlins and Kawasaki as "collaborative," and that Kawasaki's own marketing literature for the 2006 Ninja states that the "racing quality" steering system was developed "in collaboration with Ohlins." The Thompsons also assert that the SD-1791 steering damper was adapted to be used exclusively by Kawasaki as the OEM damper for the Ninja ZX-10R.

In reply, Ohlins argues that, whatever Mr. Higinbotham may have opined, the record evidence shows that Ohlins did not "substantially participate" in the integration of the SD-1791 steering damper into the 2007 Ninja.

### 2. *Component manufacturer liability for a "design defect"*

The Eighth Circuit Court of Appeals has recognized that, with respect to design defects, manufacturers of component parts generally are not liable for the design of the final product into which their parts are incorporated. *In re Temporomandibular Joint Implants (TMJ) Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996). The rationale for such a rule is that "'[a] component part supplier should not be cast in the role of insurer for any accident that may arise after that component part leaves the supplier's hands.'" *Id.* at 1056 (quoting *Crossfield v. Quality Control Equip. Co.*, 1 F.3d 701, 705 (8th Cir. 1993)); *see also* RESTATEMENT (THIRD) § 5, cmt. *a* ("As a general rule, component sellers should not be liable when the component itself is not defective as defined in this Chapter. If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective.").

However, RESTATEMENT (THIRD) § 5(b) provides an exception to this rule, as follows:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> > * * *
> >
> > (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
> >
> > (b)(2) the integration of the component causes the product to be defective, as defined in this Chapter; and
> >
> > (b)(3) the defect in the product causes the harm.

RESTATEMENT (THIRD) § 5(b) (emphasis added). The Iowa Supreme Court has not expressly adopted § 5 of the RESTATEMENT (THIRD), although it has expressly adopted §§ 1 and 2. *Scott*, 774 N.W.2d at 504. Assuming, without deciding, that the Iowa Supreme Court would do so, as part of a comprehensive scheme for products liability law, I look to the language of and comments to § 5(b) itself and to the decisions of other courts for guidance on the requirements for liability of a parts manufacturer for a "design defect" pursuant to § 5(b).

Comment *e* to this section of the RESTATEMENT (THIRD) explains the "substantial participation" requirement, as follows:

> *e. Substantial participation in the integration of the component into the design of another product.* When the component seller is substantially involved in the integration of the component into the design of the integrated product, the component seller is subject to liability when the integration results in a defective product and the defect

causes harm to the plaintiff. *Substantial participation can take various forms. The manufacturer or assembler of the integrated product may invite the component seller to design a component that will perform specifically as part of the integrated product or to assist in modifying the design of the integrated product to accept the seller's component. Or the component seller may play a substantial role in deciding which component best serves the requirements of the integrated product.* When the component seller substantially participates in the design of the integrated product, it is fair and reasonable to hold the component seller responsible for harm caused by the defective, integrated product. *A component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the design of the product, is not liable within the meaning of Subsection (b). Moreover, providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability.* One who provides a design service alone, as distinct from combining the design function with the sale of a component, generally is liable only for negligence and is not treated as a product seller. See § 19(b).

RESTATEMENT (THIRD) § 5(b), cmt. *e* (emphasis added).

In light of this comment, the United States District for the District of Minnesota, applying Minnesota law, concluded that recommending a certain specification for a part—in that case, the size of a vent hole for a gas pipeline electrofusion unit—"that is not incorporated into the final design cannot serve as the basis for liability" under § 5(b), and that a part manufacturer "cannot be found to have participated in the design of the [component] if its design recommendation was disregarded." *Schanhaar v. EF Technologies, Inc.*, Civil No. 08–5382 ADM/LIB, 2010 WL 4056045, *4 (D. Minn. Oct. 14, 2010); *see also Del Signore v. Asphalt Drum Mixers*, 182 F. Supp. 2d 730, 745 (concluding, using RESTATEMENT (THIRD) § 2 and comment *e* for guidance, that a

manufacturer of certain equipment for a "wet wash pond" air cleaning system was not liable on the basis of "substantial participation" in the integration of its equipment into the design of the pond, where it only provided some technical guidance and advice as to the water volume of the pond, its maximum distance from the plant, and some dimensions; the record did not even show whether the owner building the pond would have followed the equipment manufacturer's advice; and the equipment manufacturer had no control over what the owner did with its equipment at the owner's complex). Similarly, state courts applying RESTATEMENT (THIRD) § 5(b) have required that the component manufacturer "have had some control over the decision-making process of the final product or system" to have "substantially participated" in the design of the integrated product. *Gudmundson v. Del Ozone*, 232 P.3d 1059, 1073 (Utah. 2010) (citing cases); *see also Toshiba Int'l Corp. v. Henry*, 152 S.W.3d 774, 782 (Tex. Ct. App. 2004) (concluding that "substantial participation" liability for a "design defect" would not lie against a component manufacturer, *inter alia*, where the system manufacturer was in "total control of the design of that system"). Thus, "substantial participation" requires more than a component manufacturer giving technical advice to the manufacturer of the integrated product; it requires that the component manufacturer's advice actually be heeded and that the component manufacturer actually have some control over the design of the integrated product.

### 3. *Application of the standards*

It is possible that the Thompsons have generated genuine issues of material fact as to whether Ohlins "substantially participated" in the design of the steering system for the 2006 Ninja ZX-10R motorcycle, but the question is whether there is sufficient evidence to generate a genuine issue of material fact as to whether Ohlins "substantially participated" in the design of the steering system for the 2007 Ninja ZX-10R

motorcycle. The Thompsons' assertions notwithstanding, such evidence is sorely lacking here.

The Thompsons rely on e-mails from Ohlins engineers to Kawasaki about the change in the steering damper for the 2007 Ninja ZX-10R. *See* Plaintiffs' Appendix, Exhibit 11 (March 30, 2006, e-mail from Björkman at Ohlins to Okabe at Kawasaki stating, "May I ask why you want to reduce damping? We have heard that in some case[s], the brackets have cracked. With reduced damping this can be solved. I just want to inform you that many people that are going to race, or just run on track, have bought another needle from our distributors and changed it in the SD. This needle is without bleed hole, so it gives more damping. As I said, I just want to inform you, so you know that some people do like this."); *id.* at Exhibit 12 (April 11, 2006, e-mail from Okabe at Kawasaki to Björkman at Ohlins, stating, "We think this spec is OK for next year model. But also we want to know the tolerance of damping. How do you think this spec's maixmam [sic] damping of production torelance [sic]? You think tolerance is OK, we go ahead," and Björkman's response, "OK. It is difficult to say the tolerance now. We have only tried one needle. I will set the diameter tolerance of the bleed hole, on the needle drawing, to a little plus tolerance so the damping is not much over this value. I don't think you want very much less damping either, because then there is almost no function left."); *id.* at Exhibit 10 (May 28, 2006, e-mail from Björkman at Ohlins to Okabe at Kawasaki explaining that "[t]he best way to reduce maximum damping I think is to make a new needle with different bleed hole and nose angle. Do you have the maximum damping value you want? Then we can make new needles to try and get the right value."); *id.* at Exhibit 14 (June 4, 2007, e-mail from Johnny Bräster at Ohlins to Mr. Kaiya at Kawasaki, stating, "One more important information for you is that many customers with 44071-0412 [(SD 1791)] dampers has called and asked for steering dampers with more damping force. Something we have

refused to do since we do not want to change KHI specification like the 44071-0495 [(SD 1920)] spec. and Öhlins engineering division do support this request and we have tested both spec. several times and the setting we recommend is still 44071-0495 [(SD 1920)] or 44071-0299. I ask you to reconsider the decision to make the spec. change again and I really recommend KHI to stay with the 44071-0495 [(SD 1920)] or 44071-0299 which we think is a more suitable setting for the market."); *see also id.* at Exhibit 8 (Deposition of Mr.Macklin, 47:11-49:16, 61:25-63:15, concerning this correspondence).

First, at most, the various e-mails from Ohlins's engineers to Kawasaki about the change in the steering damper for the 2007 Ninja ZX-10R, upon which the Thompsons rely, involve no more than providing mechanical or technical advice about the steering damper, how dampening levels could be changed, and the effect of changing dampening levels. *See* RESTATEMENT (THIRD) § 5(b), cmt. *e* ("[P]roviding mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability."). Second, those e-mails make clear that Kawasaki, not Ohlins, had the final say over the design decisions, including the level of dampening. *See Gudmundson*, 232 P.3d at 1073; *Toshiba Int'l Corp.*, 152 S.W.3d at 782; *Del Signore*, 182 F. Supp. 2d at 745. Finally, to the extent that Ohlins made a recommendation about whether or not to reduce dampening—that is, that Kawasaki should not reduce dampening—Kawasaki plainly *rejected* that advice. *Schanhaar*, 2010 WL 4056045 at *4.[4]

---

[4] The irony is not lost on me of the Thompsons' reliance on Björkman's April 11, 2006, e-mail to Okabe stating, "I don't think you want very much less damping either, because then there is almost no function left," to support both their contention that Ohlins "substantially participated" in the design of the motorcycle, so that Ohlins should be liable for a "design defect," and on Kawasaki's rejection of that "warning,"

From the evidence in the record cited by the Thompsons, viewed in the light most favorable to the Thompsons, a rational trier of fact could *not* find that Ohlins "substantially participated" in the integration of its steering damper into the steering system of the 2007 Ninja ZX-10R motorcycle. *Torgerson*, 643 F.3d at 1042-43. Consequently, Ohlins cannot be held liable for a "design defect" in the 2007 Ninja ZX-10R motorcycle. *See* RESTATEMENT (THIRD) § 5(b). Ohlins is also entitled to summary judgment on this claim.

## E. *Punitive Damages Claims*

The last "claim" still at issue is the Thompsons' claim in **Count VIII** for "punitive damages" against both Kawasaki and Ohlins. However, for the reasons explained more fully below, I need only consider Kawasaki's challenge to "punitive damages" on the "design defect" claim. As before, I begin my analysis of this challenge with a summary of the parties' arguments.

### 1. *Arguments of the parties*

Kawasaki argues that the Thompsons have failed to satisfy the requirement to prove intentional wrongful conduct that far exceeds the bounds of reasonableness to obtain punitive damages against Kawasaki in this case. Indeed, Kawasaki asserts that it has not engaged in any improper conduct at all. Kawasaki argues that, because this is a product liability case involving a complicated product, the Thompsons' claims must be based on the reports of their experts and, even taking those reports in the light most favorable to the Thompsons, the experts' criticisms of Kawasaki do not rise to the level of conduct warranting punitive damages under Iowa law.

---

so that Kawasaki should be liable for punitive damages for the purported "design defect."

The Thompsons assert that they have, at the very least, generated genuine issues of material fact on the requirements for an award of punitive damages against Kawasaki. Specifically, they point to evidence that Scott Thompson's motorcycle was defectively designed, and that Kawasaki has not asserted otherwise. They also argue that Kawasaki was more than merely negligent in choosing the steering damper for the 2007 Ninja ZX-10R motorcycle, meeting the standard for "legal malice," because Kawasaki intentionally and significantly decreased the dampening function of the steering damper on the 2007 Ninja ZX-10R, as compared to the steering damper on the 2006 Ninja ZX-10R; Kawasaki knew that the steering damper on the 2007 Ninja ZX-10R was a "safety device" and an essential component for the stability of the motorcycle to prevent uncontrollable "wobble" and other stability problems that caused Scott Thompson's accident; Kawasaki chose to change the steering damper, rather than increase the strength of the mounting bracket, which would not have had the same impact on motorcycle stability; Kawasaki chose to do so, contrary to the warnings and recommendations of Ohlins's engineers; and Kawasaki did so over a very short time period, as compared to the lengthy period invested in developing the steering system for the 2006 Ninja ZX-10R motorcycle model, without sufficient testing of the new design.

Kawasaki replies that Ohlins did not question the change in the steering damper based on safety concerns, but questioned the change based on the desires of racing customers. Kawasaki also argues that the Thompsons' experts' criticisms of the development and testing process for the new steering mechanism are legally insufficient to support an award of punitive damages. Kawasaki also argues that there is no evidence that Kawasaki sold the 2007 Ninja ZX-10R motorcycle with knowledge that it was unreasonably dangerous or with knowledge of prior injuries or accidents caused by the steering damper on that motorcycle. What "customer complaint" evidence the Thompsons have offered, Kawasaki argues, is inadmissible, because the Thompsons

have laid no proper foundation for it, that evidence is "riddled with hearsay," and, in any event, it is more prejudicial than probative, where there is no showing of substantial similarity.

### 2.    *Standards for punitive damages under Iowa law*

Under Iowa law, punitive damages are merely incidental to the main cause of action and they are derived from the underlying cause of action. *Campbell v. Van Roekel*, 347 N.W.2d 406, 410 (Iowa 1984). Thus, punitive damages can only be awarded when the plaintiff prevails on an underlying cause of action, then proves the requirements for punitive damages under Iowa law. *See Holt v. Quality Egg, L.L.C.*, 777 F. Supp. 2d 1160, 1172 (N.D. Iowa 2011) (also concluding that the plaintiff is not required to prove that "willful and wanton conduct" was an element of the underlying claim before punitive damages may be awarded). Here, I have now granted summary judgment in favor of Ohlins on all of the causes of action against it, and I have granted summary judgment in favor of Kawasaki on the "manufacturing defect" cause of action against it. Thus, where the only underlying cause of action still at issue is the Thompsons' claim for a "design defect" against Kawasaki, that is the only cause of action upon which punitive damages can be based, if the Thompsons first prove that cause of action. *Id.*

As the Iowa Supreme Court explained, in a products liability case,

> Iowa Code section 668A.1(1)(a) sets the standard for an award of punitive damages. Under this section, an award of punitive damages will stand when there is proof of conduct that establishes a "willful and wanton disregard for the rights or safety of another." *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 142 (Iowa 1996) (citing Iowa Code § 668A.1(1)(a)). We have approved the following definition of "willful and wanton" conduct for section 668A.1(1) purposes:

> [T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.

> *Fell [v. Kewanee Farm Equip. Co.]*, 457 N.W.2d [911,] 919 [(Iowa 1990)] (quoting W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 34, at 213 (5th ed.1984)). The evidence to support an award must be clear, convincing and satisfactory. Iowa Code § 668A.1(1)(a).

> We have noted that punitive damages serve "'as a form of punishment and to deter others from conduct which is sufficiently egregious to call for the remedy.'" *McClure [v. Walgree Co.]*, 613 N.W.2d [225,] 230 [(Iowa 2000)] (quoting *Coster v. Crookham*, 468 N.W.2d 802, 810 (Iowa 1991)). Consequently, punitive damages are appropriate only when actual or legal malice is shown. *Schultz v. Security Nat'l Bank*, 583 N.W.2d 886, 888 (Iowa 1998). Mere negligent conduct is therefore not sufficient to support a claim for punitive damages. *Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 256 (Iowa 1993).

*Mercer v. Pittway Corp.*, 616 N.W.2d 602, 617 (Iowa 2000). I have concluded that "punitive damages must be based on evidence that relates to the underlying cause of action," because IOWA CODE § 668A.1 requires that punitive damages be based on sufficient proof that "'the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.'" *Holt*, 777 F. Supp. 2d at 1173 (quoting IOWA CODE § 668A.1).

As to the "malice" requirement, the Iowa Supreme Court has also explained,

> Actual malice is characterized by such factors as personal spite, hatred, or ill will. [*Schultz*, 583 N.W.2d at 888.] Legal malice is shown by wrongful conduct

> committed or continued with a willful or reckless disregard
> for another's rights. *Id.*

*McClure*, 613 N.W.2d at 231. The Thompsons have not asserted that there is any evidence showing that Kawasaki acted with "actual malice," so their punitive damages claim must be based on an assertion that Kawasaki acted with "legal malice" in selling the 2007 Ninja ZX-10R motorcycle with a "design defect." *See Mercer*, 616 N.W.2d at 617 (explaining that, under Iowa law, "punitive damages are appropriate only when actual or legal malice is shown"); *McClure*, 613 N.W.2d at 231 (defining "actual malice" and "legal malice").

Attempting to put more meat on the bones of what "legal malice" means, I note that, in *Mercer*, the Iowa Supreme Court rejected a punitive damages claim, because the evidence showed only a reasonable disagreement over the risks and utility of the product as designed, even where the manufacturer was aware of complaints or problems with the product, and allegedly failed to test the product adequately in "real world" circumstances. *See Mercer*, 616 N.W.2d at 618. I have observed that evidence of "'disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow'" would support punitive damages, *Holt*, 777 F. Supp. 2d at 1173 (quoting *Mercer*, 616 N.W.2d at 617), and that such evidence "includes '"evidence of [a] defendant's persistent course of conduct to show that the defendant acted with no care and with disregard of the consequences of those act.'" *Id.* (quoting *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005), in turn quoting *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d at 153, 156 (Iowa 1993)). More specifically still, I concluded that evidence that the defendant had notice of problems and ignored that notice may support a conclusion that the defendant took a persistent course with no care and with disregard of the consequences. *Id.* at 1173-74 (citing cases). I have required, however, that the notice of problems be sufficiently

close in time and circumstances to be informative of the willfulness and wantonness of the conduct from which the claim arose. *Id*. at 1174.

### 3.    *Application of the standards*

Kawasaki has specifically admitted that the steering damper is a "safety device" equipped on a motorcycle for the purpose of minimizing kickback and bringing about faster convergence. *See* Kawasaki's Response To Plaintiffs' Statement Of Additional Material Facts In Opposition To The Kawasaki Defendants' Motion For Summary Judgment (docket no. 75), ¶ 7. Thus, Kawasaki was necessarily aware that changes to the steering damper had potential safety consequences.

I have rejected the Thompsons's contention that e-mails from Ohlins to Kawasaki about Kawasaki's decision to reduce the dampening force in the steering damper for the 2007 Ninja ZX-10R model motorcycle demonstrate that *Ohlins* was a "substantial participant" in the design of the steering mechanism for that model. However, the question here is quite different, as to relevance of Ohlins's e-mails to a punitive damages claim against *Kawasaki*. On that question, I do believe that this evidence generates genuine issues of material fact that *Kawasaki* had notice of potential problems with reducing the dampening level—even if Ohlins couched its comments in terms of there being almost no dampening at all, not specifically in terms of a "safety" problem—and that Kawasaki then ignored those potential problems. This evidence would warrant a reasonable juror concluding that Kawasaki took a persistent course to reduce the dampening level of the steering mechanism with no care and with disregard of the safety consequences. *Id*. at 1173-74 (citing cases concerning the relevance of evidence showing that the defendant acted with no care and with disregard of the safety consequences); *Torgerson*, 643 F.3d at 1042-43 (stating the "rational trier of fact" or "reasonable juror" standard for summary judgment). Such evidence is plainly sufficiently close in time to Kawasaki's design decisions to be informative of whether

or not Kawasaki acted willfully and wantonly in taking the actions from which the "design defect" claim arose. *Id*. at 1174.

Additional evidence reasonably supporting a prayer for "punitive damages" in light of the conduct from which the "design defect" claim arose is evidence that Kawasaki made the decision to change the steering damper, admittedly a "safety device," for the 2007 Ninja ZX-10R motorcycle within a comparatively short time, with very limited testing, and no evidence of recognition of the safety consequences of the change, when contrasted with the extensive testing and development that led to the use of the steering damper with a much higher dampening level for the 2006 Ninja ZX-10R. In this case, this evidence could lead a reasonable juror to conclude that the decision was made with no care and with disregard of the safety consequences. *Id*. at 1173-74; *Torgerson*, 643 F.3d at 1042-43 (stating the "rational trier of fact" or "reasonable juror" standard for summary judgment); *and compare Mercer*, 616 N.W.2d at 618 (finding no jury question based on alleged failure to test the product in "real world" circumstances, because the evidence from both parties concerning the testing showed only a reasonable disagreement over the relative risks and utilities of the defendant's conduct in the manufacture and production of the allegedly defective product).

Although I might not award punitive damages on the present record, that is not the question on a motion for summary judgment. From the evidence in the record cited by the Thompsons, viewed in the light most favorable to the Thompsons, a rational trier of fact could find that Kawasaki acted "willfully and wantonly" in designing the steering system of the 2007 Ninja ZX-10R motorcycle, *Torgerson*, 643 F.3d at 1042-43, so that punitive damages based on the conduct from which the "design defect" claim arose may be appropriate. *See Holt*, 777 F. Supp. 2d at 1173 (citing Iowa Code § 668A.1 as requiring that punitive damages be based on the conduct from which the

underlying cause of action arose). Consequently, Kawasaki is not entitled to summary judgment on the Thompsons' prayer for punitive damages on the "design defect" claim against it.

### III.    CONCLUSION

Upon the foregoing,

1.    KHI's and KMC's November 5, 2012, joint Motion For Partial Summary Judgment (docket no. 64) is **granted in part and denied in part,** as follows:

a.    The Motion is **granted** as to the "manufacturing defect" claim in **Count I**, the "breach of implied warranty of fitness for a particular purpose" claim in **Count II**, and the "negligence" claim in **Count III**, but

b.    The motion is **denied** as to the "design defect" claim in **Count I**, and the prayer of "punitive damages" on that underlying cause of action in **Count VIII**.

2.    Ohlins's November 27, 2011, Supplemental (Amended And Substituted) Motion For Summary Judgment (docket no. 71) is **granted in its entirety**, and Ohlins is **dismissed** from this action.

3.    This action will proceed to trial *only* on the "design defect" claim against KHI and KMC in **Count I** and the prayer for "punitive damages" on that underlying cause of action in **Count VIII**.

**IT IS SO ORDERED**.

**DATED** this 11th day of February, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA